**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALPHA CARD SERVICES LLC<br>d/b/a SIMPAY, a Pennsylvania limited liability company,<br><br>Plaintiff,<br>v.<br><br>TIMOTHY TOOMBS, an individual, and PAYCOMPASS LLC, an Arizona limited liability company,<br><br>Defendants. | CIVIL ACTION<br><br>Case No.: 2:25-cv-04907-WB<br>Hon. Wendy Beetlestone |

**AMENDED COMPLAINT**

Plaintiff Alpha Card Services, LLC d/b/a Simpay ("Simpay"), through counsel, files this Amended Complaint against Defendants Timothy Toombs ("Toombs") and PayCompass, LLC ("PayCompass" and together with Toombs, the "Defendants"), and alleges as follows:

**INTRODUCTION**

1. Simpay brings this action against Defendant Toombs for breach of contract, breach of fiduciary duty, and breach of the duty of loyalty. Simpay further brings claims against Defendants Toombs and PayCompass, jointly and severally, for misappropriation of trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act, 12 Pa.C.S. § 5301 et seq. ("Uniform Trade Secrets Act"), and misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. ("Defend Trade Secrets Act"). Finally, Simpay brings claims against PayCompass for aiding and abetting Toombs' breach of his fiduciary duties and his breach of contract. Simpay seeks damages and permanent injunctive relief, together with costs and reasonable attorneys' fees as set forth herein.

## PARTIES

2. Simpay is a limited liability company organized and existing under the laws of Pennsylvania, with its principal place of business in Trevose, Pennsylvania, and its sole member residing in Delaware.

3. Simpay is informed and believes, and based thereon alleges, that Toombs is an individual residing in the State of Tennessee.

4. PayCompass is a limited liability company organized and existing under the laws of Arizona, with its principal place of business in Tempe, Arizona. Simpay is informed and believes, and based thereon alleges, that all of PayCompass's members are citizens of Arizona. PayCompass is a competitor to Simpay.

## JURISDICTION AND VENUE

5. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Simpay asserts a claim for relief under the Defend Trade Secrets Act, 18 U.S.C. § 1836. The conduct alleged includes Toombs' misappropriation of Simpay's trade secrets during his employment and the misappropriation of Simpay's trade secrets by Toombs and PayCompass following Toombs' departure from Simpay. All Defendants' tortious conduct, including the misappropriation of trade secrets, occurred in and affects interstate commerce within the payment processing industry.

6. This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to Simpay's federal claims that they form part of the same case or controversy under Article III of the United States Constitution. All claims arise from a common nucleus of operative fact involving Defendants' misappropriation of Simpay's trade secrets and Toombs' breach of contract.

7. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within this District.

8. This Court has personal jurisdiction over Toombs because he maintained sufficient minimum contacts with Pennsylvania such that the exercise of jurisdiction over him would not offend traditional notions of fair play and substantial justice. Toombs was employed by Simpay in an executive capacity for approximately eleven months. During that time, Toombs knew that Simpay's principal place of business was in Pennsylvania and that much of its executive team, with whom he regularly communicated, resided in Pennsylvania. Toombs regularly received paychecks bearing Simpay's Pennsylvania address and received correspondence, including a termination letter, identifying Simpay's principal place of business in Trevose, Pennsylvania. Toombs also traveled to Pennsylvania for work-related purposes. Additionally, Toombs committed tortious acts and breached his employment fiduciary duties owed to Simpay, which were intended to, and did, cause harm to Simpay in Pennsylvania. Furthermore, Section 5.08 of Toombs' employment agreement, attached hereto as **Exhibit A**, located on page 11, provides that the agreement "shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania," further evidencing Toombs' connection to Pennsylvania.

9. Simpay is informed and believes, and based thereon alleges, that this Court has personal jurisdiction over PayCompass because PayCompass transacts business in Pennsylvania and has maintained sufficient minimum contacts with Pennsylvania such that the Court's exercise of jurisdiction over PayCompass does not offend traditional notions of fair play and substantial justice. Moreover, PayCompass, through its agents, directed employment solicitation efforts to Toombs, who at the time was a Simpay executive, in order to induce him to commit acts that were

either performed in Pennsylvania or caused harm in Pennsylvania, where Simpay maintains its principal place of business

10. This Court has personal jurisdiction over all Defendants under the Due Process Clause of the United States Constitution and Pennsylvania's Long Arm Statute, 42 Pa.C.S. § 5322(a)(1)-(4), because all Defendants transact business in Pennsylvania and have caused harm or tortious injury to Simpay through acts or omissions committed inside and outside of Pennsylvania.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and the harmful effects of those events and omissions were felt in this District.

## GENERAL ALLEGATIONS

### A. Background on the Payment Processing Industry and Simpay's Business Operations.

12. At all times relevant herein, the parties have participated in what is commonly known as the payment processing industry. This industry is a complex network of business entities that facilitate debit card, credit card, and other electronic payment transactions between consumers, businesses, payment processors, and financial institutions. Whenever a consumer pays for goods or services from a business, commonly referred to as a "merchant" in the payment processing industry, using a method other than cash, an electronic payment transaction occurs, and a revenue related to the authorization and settlement for such transaction is generated. The revenue derived from a transaction is shared among various entities in the chain of service providers participating in the process.

13. Simpay operates as a link in the payment system chain and functions as a Full-Service Provider ("FSP"), also in the industry commonly referred to and known as a wholesale Independent Sales Organization ("ISO"). An FSP offers a comprehensive suite of payment-related

services to businesses. These services include, *inter alia*, merchant account services, payment gateway services, and payment processing. Essentially, an FSP acts as a one-stop shop for all things related to accepting and processing payments. An FSP solicits merchants to apply for transaction processing services for credit and debit card sales from payment processors and affiliated member banks, both of which are additional links in the payment processing chain.

14. Payment processors provide services to merchants by receiving payment card transaction data from the merchants' sales with customers, verifying that the data complies with security standards, confirming that available credit or sufficient bank account balances exist, and forwarding that data to payment networks such as Visa, Mastercard, Discover, and American Express (collectively referred to as the "Card Brands") for authorization. Thereafter, the member bank that sponsors the FSP/ISO with the Card Brands settles the transactions submitted by the merchants acquired by the FSP/ISO on behalf of the payment processor and the member bank[1].

15. In addition to maintaining, servicing, and supporting existing merchant accounts for merchants it acquires, Simpay continuously seeks new business by signing agreements with payment processors and member banks, collectively referred to herein as "Service Providers," with which it has established business relationships. Under these relationships, merchants receive processing services in exchange for revenue derived from card transactions pursuant to the terms of a triparty merchant processing agreement ("MPA") between a merchant, Simpay and a Service Provider. Simpay has entered MPAs with merchants across numerous industries, including the automotive, retail, restaurant, services, wellness, and beauty industries.

16. Simpay periodically earns commissions, also referred to as "residuals," which are a portion of the transaction revenue generated from the merchants it acquires under its relationships

[1] In the case of American Express it also acts as the bank.

with various Service Providers that enter into MPAs and use Simpay's and such Service Provider's suite of payment processing services.

**B. Simpay Hires Toombs as Its Executive Vice President of Sales.**

17. On or about March 6, 2024, Simpay hired Toombs as its Executive Vice President of Sales, memorialized by a written Contract of Employment (the "Employment Agreement"). A true and correct copy of the Employment Agreement is attached hereto as **Exhibit A**.

18. Pursuant to Section 2.04 on page 4 of the Employment Agreement, under the heading "Confidential Information," Toombs acknowledged and agreed that he would not disclose any of Simpay's Confidential Information to any third party without the prior written consent of Simpay.

19. The term "Confidential Information" is defined in Section 2.04 on page 4 of the Employment Agreement as follows:

> Section 2.04. (a) As used in this Agreement, "Confidential Information" means any proprietary, secret or confidential information that generally is not known to the public, including but not limited to any such information relating to: (a) Employer's operations, business methods, business and marketing plans, sales, financial information, products or services; (b) any merchants or prospective merchants of Employer, including merchants who utilize Employer's products or services as a result of Employee's efforts; (c) Employer's payment processing services; (d) Employer's pricing information; (e) merchant agreements or applications, terminal placement agreements, payroll services agreements, service proposals or other merchant related documents; (f) merchant accounts and records, including merchant contact information (addresses, telephone numbers, email addresses), social security numbers or taxpayer identification numbers, account numbers, account histories and merchant profiles; (g) Merchant, potential merchant or client lists; (h) details regarding the functioning of computer and software programs and systems, software source documentation and computer access codes; (i) instruction and/or procedural manuals; (j) the terms and conditions of this Agreement; and (k) any other material information that the Company does not publicly disclose. Confidential Information includes all information marked or designated by Employer as confidential; and information, whether or not in written form and whether or not designated as confidential, which is known to Employee as being treated as confidential. Confidential Information may be contained in tangible materials, such as drawings, models, data, art, specifications, reports, charts,

> graphs, compilations and computer programs, or may be in the nature of unwritten knowledge. Confidential Information includes but is not limited to all information that a person may obtain by walk-through examination of the premises of Employer, discoveries, ideas, designs, drawings, specifications, techniques, models, data, programs, documentation, processes, know-how, client lists, marketing plans, and financial and technical information of Employer.

20. Toombs expressly acknowledged in Section 2.04 on page 4 of the Employment Agreement that Simpay's "Confidential Information" represented a valuable asset of Simpay.

21. Pursuant to Section 2.04 on page 4 of the Employment Agreement, following the termination of the Employment Agreement for "any cause," Toombs was required to "continue to treat as private and privileged all Confidential Information."

22. Pursuant to Section 2.04 on page 4 of the Employment Agreement, following the termination of Toombs' employment at Simpay, Toombs was contractually obligated to "deliver immediately to Employer [Simpay] all Confidential Information, in whatever form, that may be in Employee's possession or under Employee's control without making or retaining copies or excerpts of such information."

23. Under Section 4.01 on page 6 of the Employment Agreement, under the heading "**ARTICLE 4. NON-SOLICITATION**," Toombs expressly agreed to the following non-solicitation term regarding the prohibition on soliciting Simpay's merchant clients, employees, and agents:

> Commencing on the Effective Date and ending on the date that is three (3) years after the date that this Agreement is, for any reason, terminated, Employee agrees that Employee shall not directly, or indirectly through any third party, on behalf of Employee or any other person or entity, without the prior written consent of Employer, (i) solicit, cause or induce, or attempt in any way or manner to persuade or influence any Merchant to do business of the kind and type that any Merchant does or did with Employer, for or with any person or entity other than Employer, (ii) in any way interfere with the contractual or other relationship of any kind between any Merchant and Employer, or attempt to do any of the foregoing, or (iii) solicit, cause or induce, or attempt in any way to persuade or influence any employee or agent of Employer to cease his, her or its employment or agency with

> Employer. For purposes of this Agreement, (i) "Merchant" means any person or entity who utilizes or has utilized any products or services of Employer, including any Merchant solicited or serviced by Employee prior to or during the term of his Agreement, and includes the term "client" as used in this Agreement.

24. On January 17, 2025, Toombs sent an email to Simpay's leadership team tendering his resignation.

25. On January 31, 2025, Simpay sent Toombs a termination letter formally terminating Toombs' employment.

**C. <u>Toombs Breaches His Employment Agreement by Soliciting Simpay Employees to Terminate Their Employment.</u>**

26. On or about March 25, 2025, Patrick Geyer of New Hospitality LLC sent an email to Toombs at his former Simpay email address, ttoombs@simpay.net.

27. In accordance with Simpay's standard protocol, the company monitored Toombs' email account following the termination of his employment.

28. Simpay's Chief Sales Director, Josh Elsass, reviewed the email from Geyer and discovered that it contained proprietary information from a Simpay competitor, Echelon Payments, concerning an integration with an equipment manufacturer.

29. That same day, Elsass emailed Geyer to advise that Toombs was no longer employed by Simpay and asked about the purpose of the email. Geyer responded by voicemail and explained that the message was intended for Toombs' personal email address and contained client-related information.

30. Following this incident, Simpay initiated an internal investigation and interviewed several of the approximately fifty Simpay employees who had reported to Toombs during his tenure.

31. As a result of the investigation, Simpay learned from current employees that

Toombs had attempted to recruit them to join a competing venture. These recruitment efforts occurred both during and after Toombs' employment with Simpay.

32. Unbeknownst to Simpay at the time, and while still employed by the company, Toombs began recruiting other Simpay employees under his supervision to join another ISO. Simpay is informed and believes, and based thereon alleges, that the ISO was PayCompass.

33. Simpay is further informed and believes, and based thereon alleges, that Toombs, while still employed at Simpay, actively recruited Simpay employees for PayCompass at the direction of PayCompass as part of a broader scheme to misappropriate Simpay's workforce.

34. As Executive Vice President of Sales, Toombs occupied a position of substantial managerial authority and discretionary control over Simpay's business operations, its sales personnel, and its customer and merchant relationships. Commensurate with the authority and control vested in Toombs' position, Simpay permitted Toombs to access confidential information related to Simpay's sales.

35. Simpay maintained this confidential information within password-protected systems. Simpay permitted tiered levels of access to the information within those systems based on the needs of the position for each employee. Based on his position, Simpay entrusted Toombs with access to nearly all of Simpay's confidential sales-related information, including information about Simpay's top-performing employees (including their compensation packages), sales strategies, merchants, prospective merchants, and vendors.

36. By virtue of his access to Simpay's password-protected systems, Toombs was able to view, download, export, photograph, and otherwise retain confidential reports detailing which of Simpay's employees and agents were the highest performers, the margins each of them generated, and the compensation each received in return.

37. One such system is Simpay's Domo business analytics platform. The Domo system provides users with access to confidential information regarding Simpay's sales personnel and their performance metrics, including detailed reports on Simpay's sales leadership rankings, year-over-year performance trends, and comprehensive sales statistics.

38. This information derives independent economic value by virtue of being unknown to Simpay's competitors. Armed with this information, Simpay's competitors could target Simpay's top performers, significantly undermining Simpay's ability to retain top talent and effectively compete in the highly competitive merchant processing industry.

39. Simpay is informed and believes that, beginning in or before November 2024, Toombs used Simpay's Domo system to glean information regarding Simpay's highest-performing sales team members to recruit Simpay's high-performing employees and agents to PayCompass.

40. In January of 2025 alone, Toombs accessed Simpay's Sales Leader Dashboard 39 times. Between January 17, 2025, the date Toombs submitted his resignation, and his final day at Simpay on January 31, 2025, Toombs accessed the report 19 times.

41. Further, the Domo system permits users to view reports on-screen without the necessity of exporting them. In January of 2025, Toombs exported a confidential report containing account-event summaries for each sales representative three times, including one export on January 27, 2025.

42. Simpay is informed and believes that Toombs targeted high performers within his team because Toombs had direct supervisory access to them and had developed close working relationships with them.

///

///

43. In one instance, during the final two weeks of his employment at Simpay, Toombs offered a current Simpay employee, Michael Witonsky, $75,000 to leave Simpay and join PayCompass.

44. Witonsky was part of Toombs' sales team and was one of Simpay's top sales performers.

45. As Witonsky's supervisor, Toombs knew of Witonsky's high performance and intentionally targeted him for recruitment to PayCompass.

46. Simpay later discovered that, during his employment, Toombs also solicited two other Simpay employees, Amy Beretini and Dominique Richey, to leave Simpay and join PayCompass.

47. Beretini reported directly to Toombs as part of his sales team. In or about November 2024, before his termination from Simpay, Toombs told Beretini that he planned to start his own sales team and intended to hire her for that endeavor.

48. In or about December 2024, Toombs reiterated to Beretini that if he were to leave Simpay, he would offer her a position at his new company.

49. On another occasion, Toombs told Beretini that he wanted her to meet "Justin," who had a great opportunity for her. Simpay is informed and believes, and based thereon alleges, that "Justin" refers to Justin Volrath, the founder and chief executive officer of PayCompass.

50. In or about January 2025, Toombs offered Beretini a $75,000 tax-free payment and an independent contractor position with his new ISO, which Simpay is informed and believes was PayCompass. This was the same offer Toombs had made to Witonsky.

51. Between January 30, 2025, and February 24, 2025, Toombs sent a series of text messages to Beretini asking her to contact him. Toombs' communications concluded on March 4,

2025, when he sent a final message stating that he would no longer reach out but that she had his phone number if he could ever be of assistance. Simpay is informed and believes, and based thereon alleges, that Toombs was attempting to follow up on his prior solicitation for her to leave Simpay and accept the position at PayCompass.

52. As to Dominique Richey, like Beretini, Richey reported directly to Toombs as part of his sales team.

53. In or about January 2025, Toombs told Richey that he knew people in the payment processing industry if Richey was interested in exploring a position at another company. Simpay is informed and believes, and based thereon alleges, that the referenced company was PayCompass and that Toombs was attempting to solicit Richey, with whom he and Beretini had a close working relationship, to leave Simpay and join PayCompass.

54. Simpay is informed and believes, and based thereon alleges, that Toombs solicited additional Simpay employees during his employment with the intent to induce them to terminate their employment with Simpay and join PayCompass.

## D. Toombs Is Hired by PayCompass and Toombs Poaches Simpay's Employees, Agents, and Merchant Clients by Misappropriating Simpay's Trade Secrets.

55. In or about January 2025, Toombs was hired by PayCompass as a Sales Director.

56. Simpay is informed and believes, and based thereon alleges, that Toombs and PayCompass entered into an agreement as part of a coordinated scheme to misappropriate Simpay's employees, agents, merchant clients, and prospective merchant clients. As part of that scheme, Toombs and PayCompass agreed from the outset of Toombs' employment with Simpay that Toombs would remain at Simpay for only a limited period, approximately eleven months, in order to obtain access to Simpay's internal talent, confidential information, and proprietary trade secrets, which they intended to exploit for their own benefit.

57. In furtherance of this scheme, Toombs gathered information regarding Simpay's referral partners and agents, whose identities are closely held and tightly kept protected within Simpay.

58. Access to data identifying Simpay's referral partners and agents is restricted to members of Simpay's Executive Team. Although Simpay periodically sends company-wide posts identifying its top five producing sales representatives, the names of referral partners appearing on that list are blurred in those posts. A referral partner receives the post only if they are themselves ranked, and even then, the names of all other individuals on the list remain concealed.

59. The identities of Simpay's referral partners, along with the performance metrics associated with each, constitute valuable trade secret information. Simpay derives independent economic value from the secrecy of this information, which is not available to the public, competitors, or the vast majority of Simpay employees.

60. Owing to his position of trust on Simpay's Executive Team, Toombs was invited to meet with Simpay's top-performing referral partners. At one such meeting, he met Sushil Sharma, a long-standing and top-performing Simpay referral partner and agent.

61. In February 2025, after Toombs had left Simpay, he attended an event in Atlantic City where he again met with Sharma. Sharma initially believed that Toombs still worked for Simpay. However, Toombs handed Sharma a business card showing his new affiliation with PayCompass and introduced him to Justin Volrath. Toombs and Volrath then asked Sharma whether he was interested in joining PayCompass. Sharma declined but agreed to retain their contact information.

///

///

62. In or about April 2025, Volrath sent a text message to Sharma stating that he was in Sacramento and wanted to reconnect. Sharma deflected the request by stating that he was not in the state in order to avoid further contact. Volrath then asked Sharma for the phone number of Simpay's Vice President of Product, Robert Heinrich, and claimed that he only had Heinrich's email address.

63. Sharma believed this request was misleading because Heinrich's phone number is publicly available on LinkedIn. Sharma also knew that Volrath and Heinrich follow each other on LinkedIn and may have previously spoken by phone. Sharma asked Heinrich for permission to share Heinrich's number, and after receiving Heinrich's consent, he provided the number to Volrath.

64. Simpay is informed and believes, and based thereon alleges, that Toombs advised PayCompass that Heinrich was currently employed by Simpay and encouraged Volrath to attempt to recruit him.

65. Simpay is further informed and believes, and based thereon alleges, that other individuals affiliated with PayCompass have attempted to contact Sharma by email in an effort to induce him to end his relationship with Simpay.

66. On or about April 13, 2025, based on information he had received from Toombs and after obtaining Heinrich's phone number from Sharma, Volrath sent a text message to Heinrich stating that he would be in Sacramento and wanted to meet. Shortly thereafter, Heinrich met with Volrath and informed him that he was very happy at Simpay and had no interest in leaving the company.

67. Simpay is informed and believes, and based thereon alleges, that Toombs and PayCompass attempted to induce multiple former high-performing Simpay employees and agents

to resign and join PayCompass, and that PayCompass was armed with Simpay confidential information, including the employees' and agents' compensation packages and performance metrics, when those solicitations were made.

68. Simpay's list of its top-performing employees and agents and their compensation is proprietary to Simpay and constitutes valuable property protected under the Pennsylvania Uniform Trade Secrets Act and the Defend Trade Secrets Act.

69. Simpay is further informed and believes, and based thereon alleges, that Toombs and PayCompass successfully diverted prospective merchant clients who were listed on Simpay's merchant client list and prospective merchant client list to contract with PayCompass for payment processing services.

70. By virtue of his access to Simpay's password-protected systems, Toombs was able to view, download, export, photograph, and otherwise retain confidential reports detailing merchant-level information. These reports identify Simpay's merchants and disclose each merchant's monthly transaction count, monthly transaction volume, average volume per transaction, and associated processing fees.

71. Simpay's merchant list is a proprietary working document that Simpay has cultivated over its many years of operations. It represents the product of Simpay's substantial financial investment in salaries, commissions, and other resources devoted to Simpay's employees and agents, whose responsibilities include identifying, recruiting, and onboarding new merchants. The merchant list is not publicly available and cannot be replicated without significant effort and expense.

72. Simpay derives independent economic advantage from the confidentiality of its merchant list. Simpay's merchant relationships are exclusive and governed by multi-year written

agreements, making the list a competitively valuable asset in the payment-processing industry.

73. Beyond the merchant list itself, Simpay derives separate and additional economic value from the confidential transactional data associated with each merchant. When merchant identities are combined with their corresponding transaction volumes, frequency patterns, and processing-fee metrics, highly profitable merchant relationships can be identified, targeted, and diverted. By maintaining the secrecy of this information, Simpay preserves its competitive advantage and protects its position in the marketplace.

74. Simpay is further informed and believes, and based thereon alleges, that Toombs extracted additional confidential and commercially valuable information concerning Simpay's prospective merchants and disclosed that information to PayCompass for the purpose of benefiting himself and PayCompass.

75. As part of Simpay's merchant recruitment process, Simpay's employees and agents obtain statements and related financial information from prospective merchant customers. These statements contain critical data, including transaction volume, average transaction amounts, and the processing fees charged by the merchant's existing processor. Simpay inputs this information into its Feed Navigator program, which evaluates the data and generates analytics that Simpay uses to develop competitive bids designed to secure new merchant relationships.

76. Access to Feed Navigator reporting is limited. Simpay's employees and agents may view reporting only for those prospective merchants they personally enter into the system. By contrast, and owing to his position of trust on Simpay's Executive Team, Toombs had unrestricted access to all Feed Navigator reporting.

77. Simpay is informed and believes, and based thereon alleges, that Toombs misappropriated data from the Feed Navigator program and disclosed it to PayCompass, enabling

PayCompass to compete directly against Simpay for prospective merchants in whom Simpay had invested time, effort, and financial resources.

78. Similar to Simpay's existing merchant client list, Simpay's prospective merchant client list, consisting of merchants entered into the Feed Navigator program, together with the associated analytical data, constitutes proprietary information and valuable property protected under the Pennsylvania Uniform Trade Secrets Act and the Defend Trade Secrets Act.

79. Simpay's merchant client list identifies Simpay's current merchant relationships, while its prospective merchant client list identifies the businesses that represent Simpay's future sales opportunities and anticipated revenue channels.

## CAUSES OF ACTION

## COUNT ONE – BREACH OF CONTRACT (Against Defendant Toombs)

80. Simpay brings this action seeking liquidated damages and permanent injunctive relief against Toombs for breach of contract.

81. Simpay incorporates the allegations contained in paragraphs 1-79 as if fully set forth herein.

82. The Employment Agreement is a valid and enforceable contract between Simpay and Toombs.

83. Toombs breached Section 2.04 on page 4 of the Employment Agreement by disclosing Simpay's Confidential Information, as defined in the Employment Agreement, to PayCompass without Simpay's express written consent.

84. The Confidential Information that Toombs disclosed to PayCompass includes Simpay's lists of current merchant clients and prospective merchant clients.

///

85. Toombs breached Section 4.01 on page 6 of the Employment Agreement, which governs the non-solicitation terms, by soliciting current Simpay employees and agents to terminate their respective business relationships with Simpay and join Toombs' ISO and/or PayCompass.

86. Toombs' further breached Section 4.01 on page 6 of the Employment Agreement, which governs the non-solicitation terms, by misappropriating Simpay's lists of current and prospective merchant clients and soliciting those merchant clients with the intent to induce them to sign contracts with Toombs' ISO and/or PayCompass.

87. Pursuant to Section 4.01 on page 7 of the Employment Agreement, Toombs agreed that Simpay's damages resulting from any breach of the non-solicitation terms of the Employment Agreement "would be difficult or impractical to fix the actual damages," and that Simpay would be entitled to an award of liquidated damages against Toombs for such a breach as follows:

> Upon a breach of Section 4.01(a) above, **Employee agrees to pay damages to Employer in an amount equal to the greater of, (i) Five Thousand ($5,000.00) Dollars, or (ii) with regard to any Merchant, the average monthly gross profit generated for Employer by that Merchant over the three most recent months in which said Merchant used Employer's products or services multiplied by thirty-six (36), for each Merchant, employee or agent that terminates or terminated its relationship with Employer as a result of said breach.** Employee acknowledges and agrees that it would be difficult or impractical to fix the actual damages resulting from any breach by Employee of Section 4.01(a), and therefore Employee shall pay such damages not as a penalty, but as a reasonable loss actually sustained by the Employer as a result of said breach. The damages payable by Employee to Employer under this Section 4.01(b) shall be without prejudice to the rights of Employer to exercise any other rights and remedies under this Agreement, including those set forth in Article 5.01(a), or under applicable law.

(Emphasis added).

88. As a direct and proximate result of Toombs' breaches of the Employment Agreement, Simpay has been damaged.

89. Simpay's damages include, but are not limited to, loss of revenue and profits associated with diverted merchant clients and prospective merchant clients; loss of the economic

value of Simpay's Confidential Information and other proprietary data disclosed or used by Toombs; costs incurred to investigate, respond to, and mitigate the consequences of Toombs' breaches; harm to Simpay's goodwill, competitive position, and workforce stability; disruption to Simpay's relationships with its employees, agents, and merchants; and other consequential and expectancy damages arising from Toombs' improper solicitation activities and misuse of Simpay's Confidential Information.

90. As a direct and proximate result of Toombs' conduct, Simpay is entitled to recover all breach-of-contract damages available at law, including those that arise naturally and according to the usual course of things from the breach, and those damages that the parties contemplated, or reasonably should have contemplated, at the time the Employment Agreement was made as the probable result of its breach.

91. Monetary damages alone are insufficient to compensate Simpay for the losses caused by Toombs in connection with his breaches of contract, specifically his covenants to protect and not disclose Simpay's Confidential Information, as defined by the agreement, and his covenants not to solicit Simpay's merchant clients, prospective merchant clients, employees, and agents.

92. Pursuant to Section 5.01 on page 7 of the Employment Agreement, Toombs agreed that any breach of contract relating to the non-solicitation and confidentiality covenants of the Employment Agreement "will irreparably and continually damage Employer [Simpay], for which money damages may not be adequate," and that such a breach or threat of breach entitles Simpay to "(i) a preliminary or permanent injunction (without the presentment of a bond, which requirement if applicable is expressly waived by Employee [Toombs]) in order to prevent the continuation of such harm from any court of competent jurisdiction; (ii) money damages insofar

as they can be determined, except where other terms of this agreement provide for liquidated damages as a remedy; and (iii) any other damages permitted by applicable law."

93. As a direct and proximate result of Toombs' breaches of the Employment Agreement related to the solicitation of Simpay's employees, agents, current merchant clients, prospective merchant clients, and the use of Simpay's Confidential Information, as defined by the agreement, Simpay has suffered irreparable harm and will continue to suffer irreparable harm unless this Court enjoins Toombs' conduct.

94. Specifically, the Court should enjoin Toombs from soliciting or attempting to solicit any current employees of Simpay for the purpose of inducing them to terminate their employment with Simpay, soliciting or attempting to solicit Simpay's agents for the purpose of inducing them to terminate their relationship with Simpay, soliciting or attempting to solicit Simpay's current or prospective merchant clients for the purpose of poaching these merchant clients for PayCompass or another competing entity, and using or disclosing Simpay's Confidential Information, as defined by the Employment Agreement.

95. Simpay has performed all material obligations under the Employment Agreement, or such obligations have been waived or excused.

96. All conditions precedent to performance under the Employment Agreement have been performed, have occurred, or have been excused.

97. Pursuant to Section 5.10 on page 11 of the Employment Agreement, Simpay, as the prevailing party in litigation arising under the Employment Agreement, is entitled to recover its reasonable attorneys' fees and costs incurred in bringing this action.

98. Simpay has retained the services of the undersigned law firm and is obligated to pay the law firm a reasonable fee for its services.

WHEREFORE, Plaintiff, Simpay, respectfully requests that this Court enter judgment in its favor and against Defendant Toombs on Simpay's breach of contract claim, and award the following relief: (a) an award of liquidated damages pursuant to the terms of the Employment Agreement; (b) a permanent injunction enjoining Defendant Toombs from soliciting or attempting to solicit any current employees of Simpay for the purpose of inducing them to terminate their employment with Simpay, soliciting or attempting to solicit Simpay's agents for the purpose of inducing them to terminate their relationship with Simpay, soliciting or attempting to solicit Simpay's current or prospective merchant clients for the purpose of poaching these merchant clients for PayCompass or another competing entity, and using or disclosing Simpay's Confidential Information; (c) an order requiring Defendant Toombs to immediately return to Simpay all Confidential Information, in any form, that remains in his possession, custody, or control; (d) an order requiring Defendant Toombs to certify, under penalty of perjury, that he has returned or destroyed all Confidential Information and no longer retains any copies, excerpts, or summaries of such information; (e) an award of compensatory damages to the extent they can be determined, in addition to liquidated damages if applicable; (f) an award of Simpay's reasonable attorneys' fees and costs incurred in bringing this action; and (g) such other and further relief as the Court deems just and appropriate.

**COUNT TWO – BREACH OF FIDUCIARY DUTIES (Against Defendant Toombs)**

99. Simpay brings this action seeking damages against Toombs for breach of fiduciary duties.

100. Simpay incorporates the allegations contained in paragraphs 1-55 and 58-79 as if fully set forth herein.

101. During his employment as Executive Vice President of Sales, Toombs occupied a

position of trust and confidence and exercised discretionary authority over Simpay's employees, agents, merchant relationships, and business operations. Toombs' senior managerial role created fiduciary duties under Pennsylvania common law, including duties of loyalty, care, honesty, candor, fair dealing, and the obligation to place Simpay's interests above his own.

102. These fiduciary duties exist independently of the Employment Agreement and arise by operation of agency law. Toombs was required to refrain from competing with Simpay during his employment; to avoid self-dealing, to refrain from soliciting Simpay's employees, agents, or clients for the benefit of himself or any competing enterprise; to refrain from using or disclosing Simpay's proprietary information, including its Confidential Information, to disclose to Simpay any conflicting interests that may have arisen during the course of his employment; and to disclose to Simpay any conduct that was in breach of his Employment Agreement.

103. Toombs breached his fiduciary duties by recruiting Simpay employees to leave Simpay, soliciting Simpay agents to move their business to PayCompass, engaging in competitive activities while still employed by Simpay, and acting for the benefit of PayCompass rather than Simpay. Toombs further breached these duties by accessing proprietary and confidential business information for non-Simpay purposes, both before and after submitting his resignation. Toombs also concealed his efforts to poach employees and divert business opportunities, and failed to apprise Simpay of his relationship with and conduct benefiting PayCompass, Volrath, and other competing ISOs, all constituting further breaches of his fiduciary duties.

104. Beyond the Confidential Information defined in the Employment Agreement, information regarding the relative performance metrics related to each of Simpay's employees and agents, the margins each of them generated, and the compensation each received in return, constituted valuable information that Simpay protected from public disclosure.

105. In breach of his fiduciary duties to Simpay, Toombs targeted several of Simpay's highest performing employees and agents and provided the foregoing protected information to PayCompass to enable PayCompass to target those individuals as well. By using confidential information entrusted to him by virtue of his position of trust within Simpay for the purpose of competing against Simpay and assisting PayCompass in doing so, Toombs violated the fiduciary duties he owed to the company.

106. Simpay further safeguards the prospective merchant statements and related financial information that its employees and agents obtain from prospective merchant customers. Such information exists outside the ambit of the Confidential Information defined in the Employment Agreement. On information and belief, Toombs specifically targeted Simpay's prospective merchants, and provided the foregoing protected information to PayCompass to enable PayCompass to target those merchants, by disclosing and using this information in violation of his fiduciary duties.

107. Toombs utterly failed to disclose to Simpay the nature and extent of his relationships with PayCompass, Volrath, and other competing ISO's in further violation of his fiduciary duties to Simpay.

108. As a direct and proximate result of Toombs' breaches of his fiduciary duties owed to Simpay, Simpay has suffered damages, including disruption of business relationships, disruptions of business operations, competitive harm, and resources employed in investigating and discovering the extent of Toombs' misconduct.

109. Toombs' breaches of fiduciary duty were willful, wanton, malicious, and committed with the intent to harm Simpay.

///

WHEREFORE, Plaintiff, Simpay, respectfully requests that this Court enter judgment in its favor and against Defendant Toombs on Simpay's claim for breach of fiduciary duties and award the following relief: (a) an award of compensatory damages in an amount to be proven at trial; and (b) such other and further relief as the Court deems just and appropriate.

**COUNT THREE – BREACH OF THE DUTY OF LOYALTY (Against Defendant Toombs)**

110. Simpay brings this claim seeking damages against Toombs for breach of the duty of loyalty.

111. Simpay incorporates the allegations contained in paragraphs 1-55 and 58-79 as if fully set forth herein.

112. Under Pennsylvania common law, every employee owes a duty of loyalty to act in the employer's best interest and to refrain from competing with the employer during the period of employment. This duty exists separate and apart from any contractual obligations.

113. Toombs breached his duty of loyalty by soliciting Simpay employees to leave the company, recruiting Simpay referral agents to join PayCompass, diverting prospective merchant clients, and performing acts intended to undermine Simpay for the benefit of PayCompass.

114. Beyond the Confidential Information defined in the Employment Agreement, information regarding the relative performance metrics related to each of Simpay's employees and agents, the margins each of them generated, and the compensation each received in return, constituted valuable information that Simpay protected from public disclosure.

115. In breach of his duty of loyalty to Simpay, Toombs targeted several of Simpay's highest performing employees and agents and provided the foregoing protected information to PayCompass to enable PayCompass to target those individuals as well. By using private information entrusted to him by virtue of his position of trust within Simpay to compete against

Simpay and to assist others in competing against Simpay, Toombs violated the duty of loyalty he owed to the company.

116. Toombs also breached this duty by continuing to access confidential Simpay business data for purposes unrelated to advancing Simpay's business, including doing so after providing his resignation. Toombs' conduct materially and adversely affected Simpay's business interests.

117. As a direct and proximate result of these breaches, Simpay suffered damages, including disruption of business relationships, disruption of business operations, competitive harm, and the expenditure of resources to investigate and uncover the extent of Toombs' misconduct.

WHEREFORE, Plaintiff, Simpay, respectfully requests that this Court enter judgment in its favor and against Defendant Toombs on Simpay's claim for breach of the duty of loyalty and award the following relief: (a) an award of compensatory damages in an amount to be proven at trial; and (b) such other and further relief as the Court deems just and appropriate.

**COUNT FOUR – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE PENNSYLVANIA UNIFORM TRADE SECRETS ACT (Uniform Trade Secrets Act 12 Pa.C.S. § 5301 et seq.) (Against Defendants Toombs and PayCompass, jointly and severally)**

118. Simpay brings this claim seeking damages and permanent injunctive relief against Toombs, PayCompass, jointly and severally, for misappropriation of Simpay's trade secrets in violation of Pennsylvania's Uniform Trade Secrets Act, 12 Pa.C.S. § 5301 et seq.

119. Simpay incorporates the allegations contained in paragraphs 1-79 as if fully set forth herein.

120. Simpay owns and possesses trade secrets within the meaning of 12 Pa.C.S. § 5302, including but not limited to its merchant client lists, prospective merchant client lists, pricing

strategies, sales processes, referral partner information, merchant-specific transaction metrics, Simpay's top-performing employee and agent metrics, and internal business strategies, which are valuable and critically important to Simpay's business operations and competitive success.

121. Simpay has taken reasonable measures to safeguard the confidentiality and secrecy of its trade secrets, including requiring employees to sign employment agreements and handbooks containing covenants prohibiting the disclosure of Simpay's confidential and trade secret information without Simpay's express written consent, implementing internal confidentiality and data protection policies, maintaining information on password-protected servers and platforms, limiting internal access on a need-to-know basis, and designating its confidential information as proprietary and confidential in the employment agreements with its employees.

122. Simpay's trade secrets are not generally known to, and are not readily ascertainable by, competitors or the public through proper means.

123. During his employment with Simpay, Toombs was entrusted with access to Simpay's trade secrets and was obligated to protect and preserve their confidentiality.

124. Toombs misappropriated Simpay's trade secrets by disclosing, using, and continuing to use Simpay's trade secrets without Simpay's consent both during and following the termination of his employment, for his own benefit and for the benefit of PayCompass.

125. PayCompass, with knowledge that the information constituted Simpay's trade secrets, accepted, used, and benefited from the trade secrets misappropriated by Toombs to solicit Simpay's merchant clients, prospective merchant clients, referral partners, and top-performing employees.

126. By employing Toombs and knowingly using Simpay's trade secrets, Defendant PayCompass has derived, and will inevitably continue to derive, economic value and a competitive

advantage from the trade secrets misappropriated from Simpay, which PayCompass will continue to use if allowed to retain or exploit Simpay's trade secrets.

127. Monetary damages alone are insufficient to compensate Simpay for the losses caused by Defendants' misappropriation of Simpay's trade secrets. Without injunctive relief, Simpay will continue to suffer irreparable harm to its competitive position, personnel relationships, client relationships, and goodwill.

128. Defendants Toombs and PayCompass acted willfully, wantonly, maliciously, and with the intent to harm Simpay by misappropriating and using Simpay's trade secrets for their own benefit.

129. Simpay has suffered, and will continue to suffer, irreparable harm unless Defendants are enjoined from using, disclosing, or otherwise misappropriating Simpay's trade secrets.

130. Pursuant to 12 Pa.C.S. § 5303(a), Simpay is entitled to an injunction against Defendants to prevent the actual and threatened misappropriation of its trade secrets.

131. In addition, pursuant to 12 Pa.C.S. § 5303(c), this Court may compel Defendants to undertake affirmative acts necessary to protect Simpay's trade secrets, including but not limited to the immediate return and permanent deletion of any trade secrets in their possession, custody, or control.

132. Pursuant to 12 Pa.C.S. § 5304, Simpay is entitled to recover monetary damages for Defendants' misappropriation of its trade secrets, including compensation for Simpay's actual losses, the unjust enrichment obtained by Defendants that is not taken into account in computing actual losses, and, if appropriate, a reasonable royalty for Defendants' unauthorized disclosure or use of Simpay's trade secrets.

133. Pursuant to 12 Pa.C.S. § 5304(b), Simpay is entitled to an award of exemplary damages in an amount not exceeding twice the amount of actual damages because Defendants' misappropriation of Simpay's trade secrets was willful and malicious.

134. Pursuant to 12 Pa.C.S. § 5305, Simpay is entitled to an award of reasonable attorneys' fees from Defendants because Defendants' misappropriation of Simpay's trade secrets was willful and malicious.

WHEREFORE, Plaintiff, Simpay, respectfully requests that this Court enter judgment in its favor and against Defendants Toombs and PayCompass jointly and severally, on Simpay's claim for misappropriation of trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act, and award the following relief: (a) an award of compensatory damages, including damages for actual loss and unjust enrichment, in an amount to be proven at trial; (b) an award of exemplary damages pursuant to 12 Pa.C.S. § 5304(b); (c) a permanent injunction pursuant to 12 Pa.C.S. § 5303 enjoining Defendants from using or disclosing Simpay's trade secrets; (d) an order requiring Defendants to immediately return to Simpay all trade secret information, in any form, that remains in their possession, custody, or control; (e) an award of Simpay's reasonable attorneys' fees and costs incurred in bringing this action pursuant to 12 Pa.C.S. § 5305; and (f) such other and further relief as the Court deems just and appropriate.

## COUNT FIVE – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836) (Against Defendants Toombs and PayCompass, jointly and severally)

135. Simpay brings this claim seeking damages and injunctive relief against Toombs and PayCompass, jointly and severally, for misappropriation of Simpay's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836.

///

136. Simpay incorporates the allegations contained in paragraphs 1-79 as if fully set forth herein.

137. Simpay owns and possesses trade secrets, including but not limited to its merchant client lists, prospective merchant client lists, pricing strategies, sales processes, referral partner information, merchant-specific transaction information, Simpay's top-performing employee and agent metrics, and internal business strategies, which are valuable and critically important to Simpay's business operations and competitive success.

138. Simpay's trade secrets relate to products and services used in, and intended for use in, interstate commerce.

139. Pursuant to 18 U.S.C. § 1836(b)(1), Simpay, as the owner of trade secrets that are related to products and services used in, and intended for use in, interstate commerce, has the right to bring a civil action for misappropriation of its trade secrets.

140. Simpay has taken reasonable measures to safeguard the confidentiality and secrecy of its trade secrets, including requiring employees to sign employment agreements and handbooks containing covenants prohibiting the disclosure of Simpay's confidential information without Simpay's express written consent, implementing internal confidentiality and data protection policies, maintaining information on password-protected servers and platforms, limiting internal access on a need-to-know basis, and designating its confidential information as proprietary and confidential in the employment agreements with its employees.

141. Simpay's trade secrets are not generally known to, and are not readily ascertainable by, persons who could economically benefit from their disclosure or use.

142. During his employment with Simpay, Toombs was given access to Simpay's trade secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use.

143. Toombs misappropriated Simpay's trade secrets by disclosing, using, and continuing to use Simpay's trade secrets without Simpay's consent, for his own benefit and for the benefit of PayCompass.

144. PayCompass, with knowledge that the information constituted Simpay's trade secrets, accepted, used, and benefited from the trade secrets misappropriated by Toombs to solicit Simpay's merchant clients, prospective merchant clients, referral partners, and top-performing employees.

145. By employing Toombs and knowingly using Simpay's trade secrets, Defendant PayCompass has derived and will inevitably continue to derive economic value and a competitive advantage from the trade secrets misappropriated from Simpay, which PayCompass will inevitably continue to use if PayCompass is permitted to retain or exploit Simpay's trade secrets.

146. Monetary damages alone are insufficient to compensate Simpay for the losses caused by Defendants' misappropriation of Simpay's trade secrets. Without injunctive relief, Simpay will continue to suffer irreparable harm to its competitive position, personnel relationships, client relationships, and goodwill, and the continuing threat of use and disclosure of Simpay's trade secrets by Defendants poses further irreparable harm to Simpay's business interests, warranting permanent injunctive relief under 18 U.S.C. § 1836(b)(3)(A).

147. Defendants Toombs and PayCompass knew or had reason to know that their acquisition, disclosure, and use of Simpay's trade secrets was improper and undertaken without Simpay's consent.

148. Defendants' misappropriation was willful, wanton, malicious, and committed with the intent to harm Simpay.

///

149. Simpay has suffered, and will continue to suffer, irreparable harm unless Defendants are enjoined from using, disclosing, or otherwise misappropriating Simpay's trade secrets.

150. Pursuant to 18 U.S.C. § 1836(b)(3)(A), Simpay is entitled to injunctive relief to prevent any actual or threatened misappropriation of its trade secrets by Defendants on such terms as the Court deems reasonable. In addition, the Court may compel Defendants to undertake affirmative actions necessary to protect Simpay's trade secrets, and, in exceptional circumstances, condition future use upon payment of a reasonable royalty.

151. Pursuant to 18 U.S.C. § 1836(b)(3)(B), Simpay is entitled to recover damages for the actual loss caused by Defendants' misappropriation of its trade secrets and for any unjust enrichment caused by the misappropriation that is not addressed in computing damages for actual loss. Alternatively, Simpay is entitled to recover damages measured by the imposition of a reasonable royalty for Defendants' unauthorized disclosure or use of Simpay's trade secrets.

152. Pursuant to 18 U.S.C. § 1836(b)(3)(C), Defendants' misappropriation was willful and malicious, and Simpay is entitled to an award of exemplary damages in an amount not more than two times the amount of damages awarded under 18 U.S.C. § 1836(b)(3)(B).

153. Pursuant to 18 U.S.C. § 1836(b)(3)(D), Simpay is entitled to an award of reasonable attorneys' fees from Defendants because Defendants' misappropriation of Simpay's trade secrets was willful and malicious.

WHEREFORE, Plaintiff, Simpay, respectfully requests that this Court enter judgment in its favor and against Defendants Toombs and PayCompass, jointly and severally, on Simpay's claim for misappropriation of trade secrets in violation of the Defend Trade Secrets Act, and award the following relief: (a) an award of compensatory damages, including damages for actual loss and

unjust enrichment, in an amount to be proven at trial; (b) an award of exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C); (c) a permanent injunction pursuant to 18 U.S.C. § 1836(b)(3)(A) enjoining Defendants from using or disclosing Simpay's trade secrets; (d) an order requiring Defendants to immediately return to Simpay all trade secret information, in any form, that remains in their possession, custody, or control; and (e) an award of Simpay's reasonable attorneys' fees and costs.

**COUNT SIX – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (Against PayCompass)**

154. Simpay brings this claim seeking damages against PayCompass for aiding and abetting Toombs's breach of his fiduciary duties.

155. Simpay incorporates the allegations contained in paragraphs 1-55, 58-79, and 103-111 as if fully set forth herein.

156. As an employee with managerial authority, Toombs owed fiduciary duties to Simpay. PayCompass knew of these duties, including Toombs' obligation to act in Simpay's best interest, refrain from soliciting employees and agents, and avoid competitive conduct during his employment.

157. PayCompass knowingly induced and substantially assisted Toombs' breaches by directing or encouraging him to recruit Simpay employees, divert agents, and exploit his position for the benefit of PayCompass.

158. In January of 2025, while still a Simpay employee, Toombs offered two current Simpay employees, Michael Witonsky and Amy Beretini, $75,000 each to leave Simpay and join PayCompass. Simpay is informed and believes, and based thereon alleges, that PayCompass directed Toombs to make these offers on its behalf and intended to pay Witonsky and Beretini the $75,000 if they accepted the solicitations.

159. Simpay is informed and believes, and based thereon alleges, that Volrath, on behalf of PayCompass, directed Toombs to make such introductions so that PayCompass could poach Simpay's top-performing agents.

160. PayCompass also knowingly accepted information that Toombs obtained through his position of trust. By directing Toombs to facilitate interactions with and recruit only Simpay's highest performing employees and agents, PayCompass was encouraging the dissemination of and knowingly accepting Simpay confidential information regarding the performance of Simpay's employees and agents.

161. PayCompass's direction to and knowing participation in Toombs' breaches caused Simpay to suffer damages, including loss of employee morale, competitive injuries, and disruption of business relationships.

162. Simpay is entitled to compensatory damages and all other available remedies.

WHEREFORE, Plaintiff, Simpay, respectfully requests that this Court enter judgment in its favor and against Defendant PayCompass on Simpay's claim for aiding and abetting Toombs' breach of fiduciary duties and award the following relief: (a) an award of compensatory damages in an amount to be proven at trial; and (b) such other and further relief as the Court deems just and appropriate.

**COUNT SEVEN – TORTIOUS INTERFERENCE WITH CONTRACT (Against PayCompass)**

163. Simpay brings this claim seeking damages against PayCompass for tortious interference Toombs' breach of contract.

164. Simpay incorporates the allegations contained in paragraphs 1-98 as if fully set forth herein.

///

165. Toombs and Simpay were parties to a valid employment agreement containing enforceable non-solicitation, confidentiality, and loyalty obligations. PayCompass was aware of the contract and its material terms, including Toombs' obligation not to solicit Simpay employees, agents, or merchant clients.

166. PayCompass intentionally induced Toombs to breach the employment agreement by directing him to recruit employees, solicit agents, and divert business opportunities to PayCompass. PayCompass's conduct was undertaken without justification and for the specific purpose of harming Simpay and benefiting PayCompass.

167. By way of example, in January of 2025, while still a Simpay employee, Toombs offered two current Simpay employees, Michael Witonsky and Amy Beretini, $75,000 each to leave Simpay and join PayCompass. Simpay is informed and believes, and based thereon alleges, that PayCompass, with knowledge of Toombs' restrictive covenants, directed Toombs to make these offers on its behalf and intended to pay Witonsky and Beretini the $75,000 if they accepted the solicitations.

168. In February of 2025, Toombs introduced Justin Volrath to Sushil Sharma at an industry event. Volrath took the opportunity to attempt to recruit Sharma to PayCompass. Simpay is informed and believes, and based thereon alleges, that Volrath, on behalf of PayCompass and with knowledge of Toombs' restrictive covenants, directed Toombs to make such introductions so that PayCompass could poach Simpay's top-performing agents.

169. Toombs breached the employment agreement as a result of PayCompass's actions, and those breaches caused Simpay to suffer damages, including loss of employee morale, competitive injuries, and disruption of business relationships.

///

170. Simpay is entitled to compensatory damages and all other remedies allowed under Pennsylvania law.

WHEREFORE, Plaintiff, Simpay, respectfully requests that this Court enter judgment in its favor and against Defendant PayCompass on Simpay's claim for tortious interference with contract and award the following relief: (a) an award of compensatory damages in an amount to be proven at trial; and (b) such other and further relief as the Court deems just and appropriate.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiff, Simpay, respectfully requests that this Court enter judgment in its favor and against Defendants, as applicable, and award the following relief:

A. Granting permanent injunctive relief pursuant to 12 Pa.C.S. § 5303, and/or 18 U.S.C. § 1836(b)(3)(A);

B. Awarding liquidated damages against Defendant Toombs for breach of contract pursuant to the terms of the Employment Agreement;

C. Awarding compensatory damages in an amount to be established at trial against Defendant Toombs for breach of his fiduciary duties to Simpay;

D. Awarding compensatory damages in an amount to be established at trial against Defendants Toombs and PayCompass, jointly and severally, for misappropriation of Simpay's trade secrets in violation of Pennsylvania's Uniform Trade Secrets Act, including actual loss, unjust enrichment, and exemplary damages pursuant to 12 Pa.C.S. § 5304(b);

E. Awarding compensatory damages in an amount to be established at trial against Defendants Toombs and PayCompass, jointly and severally, for misappropriation of Simpay's trade secrets in violation of the Defend Trade Secrets Act, including

actual loss, unjust enrichment, and exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C);

F. Awarding Simpay its reasonable attorneys' fees and costs incurred in connection with prosecuting its breach of contract claim against Defendant Toombs pursuant to Section 5.10 of Toombs' Employment Agreement;

G. Awarding Simpay its reasonable attorneys' fees, expenses, and costs incurred in connection with prosecuting its claim for misappropriation of trade secrets under Pennsylvania's Uniform Trade Secrets Act against Defendants Toombs and PayCompass, jointly and severally, pursuant to 12 Pa.C.S. § 5305;

H. Awarding Simpay its reasonable attorneys' fees, expenses, and costs incurred in connection with prosecuting its claim for misappropriation of trade secrets under the Defend Trade Secrets Act against Defendants Toombs and PayCompass, jointly and severally, pursuant to 18 U.S.C. § 1836(b)(3)(D);

I. Awarding compensatory damages in an amount to be established at trial against Defendant PayCompass for aiding and abetting Toombs's breach of his fiduciary duties to Simpay, including but not limited to damages for loss of employee morale, competitive injuries, and disruption of business relationships;

J. Awarding compensatory damages in an amount to be established at trial against Defendant PayCompass for tortious interference with contract, including but not limited to damages arising from the diversion of business opportunities, solicitation of employees and agents, and competitive harm suffered by Simpay;

K. Awarding Simpay all its recoverable costs;

L. Awarding prejudgment interest; and

M. Awarding such other and further relief as this Court deems just and appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 8th day of December 2025.

Respectfully submitted,

By: */s/ Jordan Michael Krassner*
Jordan M. Krassner (admitted *pro hac vice*)
**GLOBAL LEGAL LAW FIRM PLLC**
900 N. Federal Hwy., Suite 370
Boca Raton, FL 33432
Telephone: 760-459-1757
jkrassner@attorneygl.com

Richard L. Vanderslice, Esq.
Pennsylvania Bar Number: 202153
**RICHARD L. VANDERSLICE, P.C.**
1445 Snyder Avenue
Philadelphia, PA 19145
Telephone: (215) 515-7197
rlv@vanderslicelaw.com

*Attorneys for Plaintiff,*
*Alpha Card Services LLC d/b/a Simpay*

**CERTIFICATE OF SERVICE**

I, Jordan Michael Krassner, hereby certify that I served the foregoing via the CM/ECF on December 8, 2025, which automatically sends notice of an electronic filing to all counsel and registered users of record.

By: *<u>/s/ Jordan Michael Krassner</u>*
Jordan Michael Krassner, Esq.