IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ALPHA CARD SERVICES, LLC,**<br>**Plaintiff,**<br><br>**v.**<br><br>**TIMOTHY TOOMBS**<br>**PAYCOMPASS LLC,**<br>**Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO.  25CV4907** |

## <u>MEMORANDUM OPINION</u>

This action arises from the departure of an employee, Defendant Timothy Toombs, from Plaintiff Alpha Card Services, LLC d/b/a Simpay ("Simpay"), and his alleged use of Simpay's confidential information and solicitation of Simpay employees in concert with his new employer, Defendant PayCompass, LLC ("PayCompass").  Simpay has sued both Toombs and PayCompass for misappropriation of trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act, 12 Pa.C.S. § 5301 *et seq*. ("Uniform Trade Secrets Act"), and misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. ("Defend Trade Secrets Act").  He has also brought claims against Toombs alone for breach of contract, breach of fiduciary duty, and breach of the duty of loyalty; and against PayCompass alone for tortious interference with contract and aiding and abetting Toombs's alleged breaches of fiduciary duty.  Before the Court are Defendants Toombs's and PayCompass's motions to dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons that follow, the motions will be denied.

### I.    FACTUAL BACKGROUND[1]

---

[1] The well-pleaded allegations in Plaintiffs' Amended Complaint are taken as true at this stage.  *Fowler v. UPMC*

In March 2024, Simpay hired Timothy Toombs as its Executive Vice President of Sales. Simpay is a full-service provider ("FSP") in the payment processing industry. As an FSP, Simpay serves as a one-stop shop for all matters related to merchants accepting and processing payments. FSPs solicit merchants to apply for transaction processing services for credit and debit card sales from payment processors and affiliated member banks, both of which are additional links in the payment processing chain. In his role, Toombs exercised substantial discretionary authority over Simpay's sales operations, personnel, agents, referral partners, and merchant relationships and supervised approximately fifty employees.

Toombs's employment was governed by a written employment agreement (the "Employment Agreement") requiring him to protect Simpay's confidential information and refrain from soliciting Simpay employees, agents, and merchants both during his employment and for three years thereafter.

On January 17, 2025, about nine months after he began working for Simpay, Toombs resigned. Simpay sent him a termination letter formally ending his employment. Then, shortly thereafter, Toombs went to work for PayCompass, a competitor to Simpay, as its Sales Director.

After Toombs left, Simpay discovered communications directed to his former Simpay email address, though intended for his personal email address, that contained proprietary competitor information. Simpay opened an investigation, during which it interviewed several

---

*Shadyside*, 578 F.3d 203, 210- 11 (3d Cir. 2009). Additionally, despite Simpay making allegations "upon information and belief," the Third Circuit recognizes that allegations based "upon information and belief" may be sufficient to state a claim "[w]here it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control"—so long as there are no "*boilerplate and conclusory allegations* " and "*[p]laintiffs . . . accompany their legal theory with factual allegations that make their theoretically viable claim plausible.*" *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir. 2002) (quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir. 1997)) (emphasis in original). In such circumstances, "allegations of fact pled 'upon information and belief' are entitled to the same presumption of truth as other factual allegations." *DePuy Synthes Sales, Inc. v. Globus Med., Inc.*, 259 F. Supp.3d 225, 240 (E.D. Pa. 2017) (citing *McDermott v. Clondalkin Grp. Inc.*, 649 Fed. App'x 263, 267-68 (3d Cir. 2016).

employees who had reported to Toombs and learned that Toombs, both during and after his employment, had attempted to recruit several Simpay employees to join a competing venture—PayCompass.

Simpay alleges that Toombs and PayCompass entered into an agreement prior to his employment with Simpay "as part of a coordinated scheme to misappropriate Simpay's employees, agents, merchant clients, and prospective clients," and that, as part of that scheme, Toombs obtained employment with Simpay for only a limited period in order "to obtain access to Simpay's internal talent, confidential information, and proprietary trade secrets, which they intended to exploit for their own benefit."

### A.  Employee Solicitation

Simpay alleges that Toombs and PayCompass attempted to induce multiple high-performing Simpay employees and agents to resign and join PayCompass, and that PayCompass was armed with Simpay confidential information, including the employees' and agents' compensation packages and performance metrics, when those solicitations were made.

At Simpay, Toombs had access to nearly all of Simpay's confidential sales-related information, including information regarding its top-performing employees, their compensation packages, sales strategies, merchants, prospective merchants, and vendors.  Because he had access to Simpay's password-protected systems, Toombs was able to view, download, export, photograph, and otherwise retain confidential reports identifying Simpay's highest-performing employees and agents, the margins they generated, and the compensation they received.

One such system was Simpay's Domo business analytics platform.  Domo provided users with access to confidential information concerning Simpay's sales personnel and performance metrics, including detailed reports on sales leadership rankings, year-over-year performance

trends, and comprehensive sales statistics.

Simpay alleges that beginning in or before November 2024, Toombs "used Simpay's Domo system to glean information regarding Simpay's highest-performing sales team members to recruit Simpay's high-performing employees and agents to PayCompass." It notes that, in January of 2025 alone, Toombs accessed Simpay's Sales Leader Dashboard on the Domo system 39 times. Between January 17, 2025, the date Toombs submitted his resignation, and his final day at Simpay on January 31, 2025, he accessed the sales leader report 19 times. Simpay also alleges that, although the Domo system permitted users to view reports on screen without exporting them, Toombs exported confidential reports containing account-event summaries for each sales representative three times in January 2025, including one export on January 27, 2025.

Simpay further alleges three specific instances of solicitation. First, during the final two weeks of his employment, Toombs offered current Simpay employee Michael Witonsky—who was part of Toombs's sales team and one of Simpay's top sales performers—$75,000 to leave Simpay and join PayCompass. As Witonsky's supervisor, Toombs knew of Witonsky's high performance and intentionally targeted him for recruitment to PayCompass.

Simpay later discovered that, during his employment, Toombs also solicited two other members of his sales team, Amy Beretini and Dominique Richey, to leave Simpay and join PayCompass.

With respect to Beretini, Simpay alleges that, in or about November 2024, Toombs told her that he planned to start his own sales team and intended to hire her for that endeavor. In or about December 2024, Toombs reiterated to Beretini that if he were to leave Simpay, he would offer her a position at his new company. On another occasion, Toombs told Beretini that he wanted her to meet "Justin," who had a great opportunity for her. Simpay believes that "Justin"

refers to Justin Volrath, the founder and chief executive officer of PayCompass. In or about January 2025, Toombs offered Beretini a $75,000 tax-free payment and an independent contractor position with what Simpay alleges was PayCompass. Between January 30, 2025, and February 24, 2025, Toombs sent a series of text messages to Beretini asking her to contact him. Those communications concluded on March 4, 2025, when Toombs sent a final message stating that he would no longer reach out but that she had his phone number if he could ever be of assistance.

As to Dominique Richey, Simpay alleges that, in or about January 2025, Toombs told Richey that he knew people in the payment-processing industry if Richey was interested in exploring a position at another company.

### B.  Referral Partners and Agents

Simpay also maintains proprietary information regarding its referral partners and agents. The identities and performance metrics of those referral partners and agents are tightly restricted to Simpay's Executive Team and are deliberately obscured even in internal communications. Owing to his position of trust on Simpay's Executive Team, Toombs was invited to meet with Simpay's top-performing referral partners. At one such meeting, he met Sushil Sharma, a long-standing and top-performing Simpay referral partner and agent. In February 2025, after Toombs had left Simpay, he attended an event in Atlantic City where he again met with Sharma, introduced him to Justin Volrath, and asked him whether he was interested in joining PayCompass. Sharma declined.

### C.  Merchant Client Lists

Simpay alleges that Toombs and PayCompass successfully diverted current and prospective merchant clients who were listed on Simpay's merchant client list and prospective

5

merchant client list to contract with PayCompass for payment processing services.

The merchant list is not publicly available and cannot be replicated without significant effort and expense. Beyond the merchant list itself, Simpay derives separate and additional economic value from the confidential transactional data associated with each merchant. When merchant identities are combined with their corresponding transaction volumes, frequency patterns, and processing-fee metrics, highly profitable merchant relationships can be identified, targeted, and diverted.

Toombs was able to view, download, export, photograph, and otherwise retain confidential reports detailing merchant-level information. These reports identify Simpay's merchants and disclose each merchant's monthly transaction count, monthly transaction volume, average volume per transaction, and associated processing fees.

Simpay's prospective merchant client lists include analytics generated through its Feed Navigator program, which compiles merchant statements and produces transaction-based data used to formulate competitive bids. Simpay alleges that Toombs misappropriated data from the Feed Navigator program and disclosed it to PayCompass, enabling PayCompass to compete directly against Simpay for prospective merchants in whom Simpay had invested time, effort, and financial resources.

## II.    LEGAL STANDARDS

To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

6

defendant is liable for the misconduct alleged."  *Id*.  "Threadbare" recitations of the elements of a claim supported only by "conclusory statements" do not suffice.  *Id*. at 683.  Rather, a plaintiff must allege some facts to raise the allegation above the level of mere speculation.  *Great W. Mining & Min. Co. v. Fox Rothschild, LLP*, 615 F.3d 159, 176 (3d Cir. 2010) (citing *Twombly*, 550 U.S. at 555).

In evaluating a motion to dismiss, the complaint must be construed "in the light most favorable to the plaintiff," with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted).  Legal conclusions are disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those facts state a "plausible claim for relief."  *Id*. at 210-11.

A complaint must also be dismissed where, as a matter of law, "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).  Thus, dismissal under Rule 12(b)(6) is appropriate where the complaint is barred by a dispositive issue of law.

"In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).  Documents "integral to or explicitly relied upon in the complaint" may also be considered without converting a motion to dismiss into one for summary judgment.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted and emphasis removed).  Here, Simpay attached Toombs's Employment Agreement with Simpay as

an exhibit to its Amended Complaint.

### III.    DISCUSSION

#### A.  Breach of Contract

Toombs first moves to dismiss Simpay's breach of contract claim on the grounds that the Amended Complaint fails to plausibly state such a claim.

Under Pennsylvania law, a plaintiff states a claim for breach of contract by alleging: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *See CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. 1999).  In the Amended Complaint, Simpay alleges that Toombs breached the Employment Agreement in two regards: first, by disclosing Simpay's confidential information to PayCompass without Simpay's written consent, in violation of Section 2.04; and second, by soliciting Simpay employees, current clients, and prospective clients away from Simpay in violation of Sections 2.03 and 4.01.

First, as to Simpay's allegations regarding disclosure of confidential information, Simpay alleges that Toombs breached Section 2.04 "by disclosing Simpay's Confidential Information, as defined in the Employment Agreement, to PayCompass without Simpay's express written consent," including Simpay's list of current and prospective merchant clients.[2]  Toombs argues

---

[2] Section 2.04 of the Employment Agreement provided that:

> upon termination of this Agreement for any cause, Employee agrees that Employee will continue to treat as private and privileged all Confidential Information, and will not release or provide any such Confidential Information to any person, firm, Employer, or other entity, either by statement, deposition, or as a witness, except upon direct written authority of Employer.

The Agreement defines "Confidential Information" as:

> any proprietary, secret or confidential information that generally is not known to the public, including but not limited to any such information relating to: (a) Employer's operations, business methods, business and marketing plans, sales, financial information, products or services; (b) any merchants or prospective merchants of Employer, including merchants who utilize Employer's

that Simpay's allegations are conclusory and that it pleads no specific facts supporting this claim because it does not allege specific instances of Toombs actually using or disclosing confidential information or that he downloaded, exported, photographed, or otherwise retained it.

Simpay responds that the Amended Complaint "specifically alleged that Toombs and PayCompass successfully diverted Simpay's merchant clients to contract with PayCompass" and that "Toombs extracted information regarding Simpay's prospective merchants and passed that information to PayCompass." For example, the Amended Complaint alleges that Toombs had access to Simpay's "Feed Navigator" program, which evaluates critical data regarding Simpay's merchants, including transaction volume, average transaction amounts, and the processing fees charged by the merchant's existing processor, to generate analytics that Simpay uses to develop competitive bids designed to secure new merchant relationships. The Amended Complaint further alleges that Toombs misappropriated this data through his unique access to the program, and disclosed it to PayCompass. Taking these factual allegations as true, they are sufficient to

---

products or services as a result of Employee's efforts; (c) Employer's payment processing services; (d) Employer's pricing information; (e) merchant agreements or applications, terminal placement agreements, payroll services agreements, service proposals or other merchant related documents; (f) merchant accounts and records, including merchant contact information (addresses, telephone numbers, email addresses), social security numbers or taxpayer identification numbers, account numbers, account histories and merchant profiles; (g) Merchant, potential merchant or client lists; (h) details regarding the functioning of computer and software programs and systems, software source documentation and computer access codes; (i) instruction and/or procedural manuals; (j) the terms and conditions of this Agreement; and (k) any other material information that the Company does not publicly disclose. Confidential Information includes all information marked or designated by Employer as confidential; and information, whether or not in written form and whether or not designated as confidential, which is known to Employee as being treated as confidential. Confidential Information may be contained in tangible materials, such as drawings, models, data, art, specifications, reports, charts, graphs, compilations and computer programs, or may be in the nature of unwritten knowledge. Confidential Information includes but is not limited to all information that a person may obtain by walk-through examination of the premises of Employer, discoveries, ideas, designs, drawings, specifications, techniques, models, data, programs, documentation, processes, know-how, client lists, marketing plans, and financial and technical information of Employer.

plausibly allege that Toombs breached his employment agreement with Simpay by violating Section 2.04's prohibition on the disclosure and use of confidential information.  *See DePuy Synthes Sales, Inc. v. Globus Med., Inc.*, 259 F. Supp.3d 225, 242 (E.D. Pa. 2017) (finding that, despite the "generalized fashion" of plaintiff's allegations that defendants used or disclosed confidential information, the "plaintiff was not required to interview its current or former customers, subpoena phone records or engage in a forensic review of its computer systems in order to include more detail in the complaint" because "[s]uch tasks remain the function of discovery").

This case is therefore unlike one in which the complaint merely alleges, in conclusory fashion, that the services an employee is providing to a competitor are "resulting, or will result in, the use or disclosure of [the employer's] Confidential Information."  *See Brightview Landscapes, LLC v. Iatzko*, 2025 WL 1710054, at *5 (E.D. Pa. June 18, 2025).  Here, the Complaint identifies the type of information Toombs accessed and alleges that he shared that information with PayCompass.  "To the extent that plaintiff is subsequently unable to adduce evidentiary support for the specific factual allegations made against defendants in the complaint, defendants are free to move for summary judgment," but the allegations here are sufficient to state a breach of contract.  Accordingly, Toombs's motion will be denied insofar as it seeks to dismiss the contract claim that arises from an alleged breach of Section 2.04.

With respect to the nonsolicitation provisions, Toombs argues that Simpay has failed to allege any damage because it has "failed to identify a single employee that it lost to PayCompass—or at all—as a result of Toombs'[s] alleged conduct.  Simpay responds that the Complaint sufficiently alleges damages because it seeks liquidated damages for each attempt to solicit a Simpay employee or agent.  Simpay is correct.

Section 4.01 of the Employment Agreement provides that because "it would be difficult or impractical to fix the actual damages resulting from any breach" by Toombs of the nonsolicitation provisions, he agreed that he would pay Simpay "an amount equal to the greater of, (i) Five Thousand ($5,000.00) Dollars, or (ii) with regard to any Merchant, the average monthly gross profit generated for Employer by that Merchant over the three most recent months . . . multiplied by thirty-six (36)." Such stipulation of liquidated damages satisfies the third prong of a breach of contract claim: resultant damages. *See Sutter Corp. v. Tri-Boro Mun. Auth.*, 487 A.2d 933, 936 (Pa. Super. 1985) ("As a general rule of law it is not necessary to show any actual damages in order to recover liquidated damages pursuant to a contract providing for liquidated damages."). Accordingly, Toombs's argument on this ground is denied.[3]

### B.  Tortious Interference With Contract

PayCompass argues that Simpay's tortious interference with contract claim against it should be dismissed because Simpay has not plausibly alleged either an underlying breach of contract or intentional interference by PayCompass. Because the Court has already concluded that Simpay has plausibly alleged a breach of contract, it addresses only PayCompass's second argument.

To state a claim for tortious interference with contract under Pennsylvania law, a plaintiff must plausibly allege: "(1) the existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering

---

[3] Toombs also argues that Simpay's reliance on his alleged solicitation of Simpay's referral partners is insufficient to state a breach of contract claim because the Employment Agreement does not prohibit him from communicating with Simpay's referral partners. Toombs is incorrect. Section 4.01 of the Employment Agreement explicitly contemplates the solicitation of referral partners in barring the "solicit[ation] . . . or attempt in any way to persuade or influence any employee or *agent* of Employer to cease his, her or its employment or agency with Employer." (emphasis added). Simpay alleges in the Amended Complaint that Toombs met with Sharma, "a long-standing and top-performing Simpay referral partner and agent," and attempted to persuade him to join PayCompass. This is sufficient to state a breach of contract claim at the motion to dismiss stage.

with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and[,] (4) the occasioning of actual damage as a result of defendant's conduct." *Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.,* 982 A.2d 94, 98 (Pa. Super. 2009), *aff'd,* 20 A.3d 468 (Pa. 2011). PayCompass contends that Simpay's claim fails on its pleading of the second element because it rests on conclusory allegations that PayCompass "directed" or "induced" Toombs to breach his Employment Agreement. PayCompass asserts that "[t]hese vague allegations are devoid of factual content demonstrating that PayCompass intentionally procured a breach of any specific contractual provision."

The Amended Complaint, however, alleges more than bare conclusions. It alleges that PayCompass maintained a relationship with Toombs while he was still employed by Simpay and agreed that he would remain at Simpay for a limited period in order to exploit his access to Simpay's employees, agents, and confidential information, despite PayCompass's awareness of Toombs's contract with Simpay. Simpay further alleges that PayCompass directed or encouraged Toombs to solicit Simpay employees and agents while he remained bound by his contractual obligations, including by offering $75,000 each to Witonsky and Beretini to induce them to leave Simpay and join PayCompass. These allegations support a reasonable inference that PayCompass specifically intended to induce contractual breaches, not merely to engage in lawful post-employment competition. *See Acclaim Sys., Inc. v. Infosys, Ltd.*, 2015 WL 4257463, at *4 (E.D. Pa. July 14, 2015) (holding that, where the former employer alleged that it had valid non-compete agreements with its former employees and that the new employer knew of those agreements but nonetheless hired the employees to work for a competitor in the same role, the plaintiff had stated a plausible claim for tortious interference); *see also Reading Radio, Inc. v. Fink*, 833 A.2d 199, 212 (Pa. Super. 2003) ("Offering employment to another company's at-will

employee is not actionable in and of itself. However, systematically inducing employees to leave their present employment is actionable when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or skilled employees. Further, when the inducement is made for the purpose of having the employees commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers, the injured employer is entitled to protection.") (internal citations omitted). Accordingly, Simpay's claim for tortious interference with contract survives.

### C.  Breach of Fiduciary Duty and Duty of Loyalty

Toombs and PayCompass both challenge Simpay's claims for breach of fiduciary duties—including the alleged duties of care, honesty, candor, and fair dealing—as well as Simpay's separate claim for breach of the duty of loyalty.

### i.    *Gist of the Action*

Toombs and PayCompass first argue that the gist of the action doctrine bars Simpay's claims for breaches of any fiduciary duty.

Whether the gist of the action doctrine applies in a particular case is a question of law. *Bohler-Uddeholm Am.*, 247 F.3d at 106. "Under Pennsylvania law, the gist of the action doctrine prevents a purely contractual duty from serving as the basis for a tort claim." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 216 (3d Cir. 2022) (citing *Bruno v. Erie Ins. Co.*, 630 Pa. 79, 106 A.3d 48, 65 (Pa. 2014)). Put differently, the doctrine precludes plaintiffs from "re-casting ordinary breach of contract claims into tort claims." *eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 14 (Pa. Super. 2002). Although "it is possible that a breach of contract also gives rise to an actionable tort," *id.*, a claim "should be limited to a contract claim when the parties'

obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts." *Bohler-Uddeholm Am.*, 247 F.3d at 104 (internal quotation omitted).

The Pennsylvania Supreme Court addressed the doctrine in *Bruno*, where it reaffirmed that the critical inquiry is the source of the duty allegedly breached:

> The general governing principle which can be derived from our prior cases is that our Court has consistently regarded the nature of the duty alleged to have been breached, as established by the underlying averments supporting the claim in a plaintiff's complaint, to be the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract. In this regard, the substance of the allegations comprising a claim in a plaintiff's complaint are of paramount importance, and, thus, the mere labeling by the plaintiff of a claim as being in tort, *e.g.*, for negligence, is not controlling. If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—*i.e.*, a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract . . . . If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

*Bruno*, 106 A.3d at 68 (citations omitted).

The crux of Toombs's argument is that the fiduciary duties Simpay alleges he breached are "expressly contemplated by the Employment Agreement," and that "Simpay has failed to allege how any fiduciary duty Toombs allegedly owed to Simpay exists outside of the Employment Agreement." That argument is unpersuasive.

*Bruno* makes clear that the gist of the action doctrine does not apply where the alleged misconduct breaches a broader social duty that exists independent of the contract. Here, irrespective of any obligations imposed by the Employment Agreement, Toombs, as Simpay's employee, owed fiduciary duties to his employer. *See Exeter Twp. v. Gardecki*, 2018 WL 6616930, at *5 (E.D. Pa. Dec. 17, 2018) ("[T]he fiduciary duty an employee owes to an

14

employer 'includes both a duty of loyalty—conducting the employer's business in the employer's best interest instead of one's own—and a duty of care—conducting the employer's business attentively and responsibly.'" (quoting *Colgate-Palmolive Co. v. Tandem Indus.*, 485 F. App'x 516, 518 (3d Cir. 2012)); *Clinmicro Immunology Ctr., LLC v. Primemed, P.C.*, 2016 WL 4107710, at *12 (M.D. Pa. July 7, 2016), *report and recommendation adopted*, 2016 WL 4119947 (M.D. Pa. July 29, 2016) (employees owe employer a duty of candor); *Food Fair Stores, Inc. v. Com., Unemployment Comp. Bd. of Rev.*, 314 A.2d 528, 529 (Pa. Commw. 1974) (employees owe employer a duty of honesty); *Kademenos v. Equitable Life Assurance Soc'y of U.S.,* 513 F.2d 1073, 1076 (3d Cir.1975) (employees owe employer a duty of fair dealing). Because those duties arise from the employer-employee relationship itself, and not solely from the Employment Agreement, the gist of the action doctrine does not bar Simpay's claims for breach of fiduciary duty and breach of the duty of loyalty.

### ii.     *Lack of Factual Support*

Toombs separately argues that Simpay's duty of loyalty claim fails for lack of factual support, particularly to the extent it relies on his alleged discussion with Sushil Sharma which occurred after Toombs's employment with Simpay.  On that point, Toombs is correct that post-employment conduct usually cannot, standing alone, establish a breach of the duty of loyalty, because that duty arises from the employment relationship and governs an employee's conduct while employed.  *See Midland-Ross Corp. v. Yokana*, 293 F.2d 411, 413 (3d Cir. 1961) (stating that pursuant to an employee's fiduciary duty of loyalty, "[h]e must not, *while employed*, act contrary to the employer's interests and, in general terms, owes a duty of loyalty as one of the incidents of the *employer-employee relationship*") (emphasis added); *see also Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211 (Pa. Super. 2003) ("To prevail on a claim of breach of fiduciary

15

duty of loyalty, a plaintiff must demonstrate that his agent acted for a person or entity whose interests conflicted with the plaintiff.") (citing Restatement (Second) of Agency § 394 (1958)); *O'Neill v. Trs. of Univ. of Pennsylvania*, 2025 WL 3047884, at \*10 (E.D. Pa. Oct. 31, 2025) (recognizing the absence of an agency relationship between an employer and non-employee).

But even if Toombs's interaction with Sharma cannot itself supply the basis for Simpay's duty of loyalty claim, the Amended Complaint alleges other conduct that plausibly does. Simpay alleges that, while still employed, Toombs solicited Simpay employees to leave the company and sought to divert merchant clients and prospective clients for the benefit of PayCompass. Those allegations are sufficient to support a plausible claim for breach of the duty of loyalty. *See McCarthy & Co., Inc. v. Pollen*, 343 A.3d 231 (Pa. Super. 2025) ("[I]t is a clear violation of an employee's duty of loyalty if, while he is still employed, he induces his employer's customers to move their business to a third party without the employer's knowledge or consent."); *AmQuip Crane Rental, LLC v. Crane & Rig Servs., LLC*, 199 A.3d 904, 915 (Pa. Super. 2018) ("Newell breached his duty of loyalty by helping other AmQuip employees . . . breach their own noncompetition covenants by leaving AmQuip and joining ACrane."). Accordingly, the claim survives even if the alleged Sharma interaction is set aside.[4]

### D. Trade Secrets

Finally, both Toombs and PayCompass argue that Simpay has failed to plausibly state claims for misappropriation of trade secrets under both the DTSA and the PUTSA.[5] "The DTSA

---

[4] PayCompass also moves to dismiss Simpay's claim for aiding and abetting Toombs's breach of fiduciary duty. Its argument, however, goes no further than asserting that the underlying breach of fiduciary duty claim is barred by the gist of the action doctrine and that an aiding and abetting claim is wholly derivative of the underlying tort, such that it necessarily fails if the primary tort claim is barred. Because the Court has already concluded that Simpay's underlying tort claims are not barred, PayCompass's argument fails as well.

[5] Toombs alone also argues that the gist of the action doctrine bars Simpay's Trade Secrets claims. "[C]ourts within this district and elsewhere within the Third Circuit have suggested that the gist of the action doctrine does not

and the PUTSA are substantially similar, as both are closely related to the Uniform Trade Secrets Act." *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 381 n.19 (3d Cir. 2021).  Thus, "the same analysis applies to [Simpay's] claims under [the DTSA and] the PUTSA and the same outcome results." *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 381 (3d Cir. 2021).

"To prevail on a trade secret misappropriation claim, a plaintiff must prove both (1) the existence of a protectable trade secret; and (2) the misappropriation of that trade secret."  *Harbor Bus. Compliance Corp. v. Firstbase.io, Inc.*, 152 F.4th 516, 527 (3d Cir. 2025).

### i.   *Protectable Trade Secret*

First, both Toombs and PayCompass argue that Simpay has failed to identify a protectable trade secret.  A protectable trade secret is information, in any form, that the owner "has taken reasonable measures to keep . . . secret," and that "derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from [its] disclosure or use."  18 U.S.C. § 1839(3).

As a threshold matter, Toombs and PayCompass contend that Simpay has failed to identify with sufficient precision the information that constitutes its trade secrets.  Simpay alleges that its trade secrets include: "merchant client lists, prospective merchant client lists, pricing strategies, sales processes, referral partner information, merchant-specific transaction metrics, Simpay's top-performing employee and agent metrics, and internal business strategies."

---

function to bar claims that seek to enforce a right created by a federal or state statute."  *Garcia v. Vertical Screen*, 592 F. Supp.3d 409, 429-30 (E.D. Pa. 2022) (citing *Sproul Hill Assocs., L.P. v. Newell Rubbermaid Inc.*, 2013 WL 6731976, at *3 (E.D. Pa. Dec. 23, 2013)); *Pittsburgh Logistics*, 2019 WL 2443035, at *9 (declining to dismiss DTSA and PUTSA claims under the gist of the action doctrine because the statutes create private rights "that are enforceable in the absence of a mutual consensus between contracting parties").  Since Simpay here seeks to enforce rights created by federal and state statutes, pertinently, the DTSA and the PUTSA, the gist of the action doctrine does not apply.  *See id*. ("Based on this persuasive authority, the Court finds that the gist of the action doctrine does not apply to bar Vertical Screen's counterclaim for misappropriation of trade secrets under the PUTSA.").

Material of that kind may constitute protectable trade secrets, and Simpay's pleading is sufficient at the motion to dismiss stage. *Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4205476, at *28 (E.D. Pa. Sept. 19, 2012) ("The confidential, sensitive, proprietary, and trade secret information Synthes entrusted to Powell included, without limitation, information about Synthes' customers, business activities, and strategies as well as information regarding Synthes' product development plans, pipeline, and launches; technology and product performance; expansion plans; pricing; competitive terms; contract and sales administration; compensation and personnel; and other sensitive information related to Synthes' business."); *Certainteed Ceilings Corp. v. Aiken*, 2015 WL 410029, at *4 (E.D. Pa. Jan. 29, 2015) ("Customer lists receive protection as trade secrets."); *Morgan's Home Equip. Corp. v. Martucci*, 136 A.2d 838, 842 (Pa. 1957) ("The customer lists and customer information which have been compiled by such firms represent a material investment of employers' time and money.  This information is highly confidential and constitutes a valuable asset.  Such data has been held to be property in the nature of a 'trade secret' for which an employer is entitled to protection, independent of a non-disclosure contract, either under the law of agency or under the law of unfair trade practices.").

Contrary to Toombs's and PayCompass's suggestion, Simpay is not required at this stage to "spell out the details" of each trade secret allegedly misappropriated to survive dismissal. *See Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021); *see also Synthes, Inc.*, 2012 WL 4205476, at *27 ("[C]ourts within the Third Circuit have not required a party alleging misappropriation to describe trade secrets with particularity in order to survive a motion to dismiss.").  Rather, the subject matter of the trade secret need only be described "with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain

18

at least the boundaries within which the secret lies." *Oakwood Lab'ys*, 999 F.3d at 906 (citing

*Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 252-53 (Cal. Ct. App. 1968)).  The Amended

Complaint does precisely that.  Requiring greater specificity at this stage would "ignore[] the

challenges a trade secret plaintiff commonly faces when only discovery will reveal exactly what

the defendants are up to."  *Id*. at 907; *see also DeRubeis v. Witten Techs., Inc.*, 244 F.R.D. 676,

680 (N.D. Ga. 2007) ("[I]f the trade secret plaintiff is forced to identify the trade secrets at issue

without knowing which of those secrets have been misappropriated, it is placed in somewhat of a

'Catch-22': Satisfying the requirement of detailed disclosure of the trade secrets without

knowledge [of] what the defendant is doing can be very difficult. If the list is too general, it will

encompass material that the defendant will be able to show cannot be trade secret.  If instead it is

too specific, it may miss what the defendant is doing." (second alteration in original) (citations

omitted)).

Next, Toombs and PayCompass argue that Simpay has failed to allege that it took

reasonable measures to protect the secrecy of its trade secrets.  The Amended Complaint,

however, alleges that Simpay "requir[es] employees to sign employment agreements and

handbooks containing covenants prohibiting the disclosure of Simpay's confidential and trade

secret information without Simpay's express written consent, implement[s] internal

confidentiality and data protection policies, maintain[s] information on password-protected

servers and platforms, limit[s] internal access on a need-to-know basis, and designat[es] its

confidential information as proprietary and confidential in the employment agreements with its

employees."  Those alleged measures are sufficient at the pleading stage.  *See Houser v.*

*Feldman*, 569 F. Supp.3d 216, 230 (E.D. Pa. 2021) (finding allegations that trade secret material

was "password protected" sufficient to allege reasonable measures to maintain secrecy); *Le Tote*

19

*Inc. v. Urban Outfitters, Inc.*, 2021 WL 2588958, at * 4 (E.D. Pa. June 24, 2021) (finding

allegations of limited access and confidentiality agreements sufficient); *Teva Pharms. USA, Inc.*

*v. Sandhu*, 291 F. Supp.3d 659, 675 (E.D. Pa. 2018) (finding reasonable measures adequately

alleged where materials were labeled confidential and access was restricted).  Accordingly,

Simpay has adequately pleaded the existence of a protectable trade secret.[6]

### ii.    *Misappropriation*

Second, Toombs and PayCompass argue that Simpay has failed to allege plausible

misappropriation.  "There are three ways to establish misappropriation under the DTSA [and

PUTSA]: improper acquisition, disclosure, *or* use of a trade secret without consent."  *Oakwood*

*Lab'ys*, 999 F.3d at 907-08 (citing 18 U.S.C. § 1839(5)) (emphasis added).  Toombs and

PayCompass contend that the Amended Complaint's allegations of improper acquisition,

disclosure, or use are merely conclusory and therefore insufficient.

The crux of their argument concerns Simpay's allegations of use.  Toombs and

PayCompass argue that the Amended Complaint alleges only access to information, not actual

use, and therefore fails to state a claim.  In the trade secret context, "use" is broadly defined as

"any exploitation of the trade secret that is likely to result in injury to the trade secret owner or

enrichment to the defendant[.] . . . Thus, marketing goods that embody the trade secret,

employing the trade secret in manufacturing or production, relying on the trade secret to assist or

---

[6] PayCompass also argues that the asserted trade secrets lack meaningful value because Simpay did not file this action until eight months after Toombs left the company and did not seek preliminary injunctive relief.  But PayCompass cites no legal authority in support of that contention. The argument is therefore forfeited.  *See Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion such as the one made here . . . will be deemed waived."); Local Rule 7.1(c) ("Every motion not certified as uncontested, or not governed by Local Civil Rule 26.1(g), shall be accompanied by a brief containing a concise statement of the legal contentions and authorities relied upon in support of the motion.") (emphasis added); *see also United States v. Heatherly*, 985 F.3d 254, 270 (3d Cir. 2021) (treating failure to "develop[ ] . . . arguments properly" as forfeiture).

accelerate research or development, or soliciting customers through the use of information that is a trade secret . . . all constitute 'use.'" *Oakwood Lab'ys*, 999 F.3d at 909 (citing G*en. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 450-51 (5th Cir. 2007)).  Moreover, "[t]he implication of use, especially at the pleading stage, can flow from circumstantial evidence alone." *Id*. at 910; *see also SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1261 (3d Cir. 1985) ("[M]isappropriation and misuse can rarely be proved by convincing direct evidence.").

Here, the Amended Complaint alleges, at a minimum, that Toombs and PayCompass solicited Simpay's merchant clients, prospective clients, referral partners, and top-performing employees—conduct that, according to Simpay, could only have been accomplished through access to Simpay's trade-secret information that Toombs shared with PayCompass, including employee performance metrics and information regarding current and prospective merchants.  At the pleading stage, Simpay need not allege direct evidence identifying each client, referral partner, or employee solicited, or the precise document from which that information was drawn. The allegations are sufficient to state plausible claims for misappropriation under both the PUTSA and the DTSA.  Accordingly, Simpay's trade secret misappropriation claims survive.[7]

An appropriate order follows.

**BY THE COURT:**

**S/ WENDY BEETLESTONE**

_____

**WENDY BEETLESTONE, C.J.**

---

[7] Simpay also argues that it has plausibly alleged improper acquisition.  Because the Court has already determined that Simpay has plausibly alleged improper use, however, it need not reach Simpay's acquisition argument.